PEOPLE, PLAINTIFF AND APPELLEE, *v.* GÓMEZ, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Ponce in a Prosecution for Voluntary Homicide.

No. 2128.—Decided May 26, 1924.

EVIDENCE—CROSS-EXAMINATION—CREDIBILITY.—Great liberality should be allowed in the cross-examination of a witness for the purpose of testing his accuracy or credibility, and where questions asked appear to relate to facts and circumstances within the general scope of the direct examination, it is error to exclude them.

ID.—ID.—STENOGRAPHIC NOTES—GRAND JURY.—When the stenographic notes of the investigation before the grand jury are transmitted to the court they become a public document, and although they can not be offered in evidence directly, they may be used for the purpose of cross-examination; therefore,

it is error to deprive the defendant of his right to impeach the testimony of a witness on the ground that the witness had made before the grand jury statements inconsistent with his testimony.

The facts are stated in the opinion.

*Mr. F. B. Fornaris* for the appellant.

*Mr. José E. Figueras, Fiscal,* for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

The evidence tended to show that the appellant Gómez and the deceased Cambrelein were enemies and that their differences arose over the connection each of them had with the work of the Municipality of Ponce, where Cambrelein was the foreman and Gómez claimed to be the carpenter. A mutual friend, Torres by name, took Gómez to the house of Cambrelein in order to make peace between the two men. The evidence also tends to show that Gómez went to the house of Cambrelein armed with a knife or dagger and that at the house the dagger was seen on his person by a witness, who gave signs to Cambrelein of that fact. When Gómez, the defendant, and Torres arrived at the house of Cambrelein, the latter received them pleasantly and asked them to be seated. Almost immediately, however, a difference arose as to whether Gómez was or was not the carpenter of the municipality and Cambrelein denied or questioned whether Gómez was such carpenter. Upon this Gómez said that if Cambrelein was alive he owed his life to the forbearance of Gómez, or words to that effect. Torres, finding that his mission had failed, managed to drag Gómez from the house of Cambrelein down steps or down grade, as the case may be. Practically all the witnesses agree that Gómez, on retiring and before retiring, insulted and defied and continued to insult and defy Cambrelein. The latter, however, followed down the hill and, as was afterwards shown, armed with a pistol that nobody knew he had. The region below was dark and dimly lighted. The two men came together in this dimly lighted region and Cambrelein, it is clear, died from a knife wound inflicted by Gómez. At the

trial Gómez was convicted of involuntary manslaughter and sentenced to eight years in the penitentiary.

The total evidence is inconsistent with any other theory than that shots were fired by Cambrelein and that one of these shots wounded Gómez. Gómez killed Cambrelein and maintained and testified that he did it in self-defence. The evidence of the Government, however, tends to show that all the shots were fired after the two men separated or were no longer struggling at close range.

The appellant contends that there was no evidence of involuntary manslaughter. However, any voluntary killing for which no legal excuse exists and which is not shown to be deliberate and premeditated, falls under the category of manslaughter.

Perhaps there was some evidence from which the jury had the right to believe that Gómez lured Cambrelein down the hill to kill him, or perhaps even that Gómez went to the house of Cambrelein with that intent or reserve intent in his mind dependent upon what Cambrelein would say or do. If Gómez had such an intent in mind, a shot fired by Cambrelein would not justify a homicide in self-defence. The principal question in this case, however, is whether the defendant at the trial was allowed all the measures that the law permits to elicit the truth from the witnesses.

The stenographer's notes taken at the session of the grand jury were filed along with the original information and came into the possession of counsel for the defendant and were in his possession during a large part of the trial. A witness of the Government, Pericás, had testified as to the manner in which Gómez had left Cambrelein's house and as to the events prior thereto. On cross-examination he was asked the following question: ''Do you recall whether during the investigation that was made by the grand jury in this same case, in this same room, between the 19th of November and now, you testified under oath before the grand jury that Ventura Cambrelein from on top and Andrés To-

rres Gómez from below continued to discuss, but on seeing them in this state we could not hold Ventura back (*no pudimos aguantar a Ventura*)?" The *fiscal* objected on the ground that no proper foundation for the question had been laid and the court overruled the objection. The witness, contemporaneously with the objection, said he did not remember. Then defendant asked whether it was that the witness did not remember giving the testimony or did not remember what he said. Before this second question was put the *fiscal* moved that the first question be stricken. The court said that he would act on the motion to strike before the close of the trial, but did not. The court did not permit the second question to be answered.

Both the district attorney and the *fiscal* of this court seemed to be under the impression that in order to confront and impeach a witness with inconsistent statements some greater specification was needed than was disclosed in the question that we have transcribed. The test would be whether the witness would readily understand the time, place and circumstances whereunder the alleged inconsistent statement was made. He was told the spot, approximately the date, and the latter was made definite by a reference to the grand jury proceedings in the same case. The witness had every opportunity to know and to understand the occasion to which reference was made and, as we find, could not fail to understand.

The court excluded the second question on the theory, as we understand it, that the sessions of the grand jury are secret. If the court was mistaken about this the appellant was unduly limited in his cross-examination because, assuming that there was an apparent contradiction in his testimony before the grand jury and the petit jury, the appellant had a right to investigate a little further. If the witness did not remember having testified before the grand jury, this failure would impeach his memory and if he said he did not remember answering the question as put, he might

still be examined as to which of the two statements was the truth and given a chance to explain. If he said he had not made the alleged impeaching statement and it was material, he could be contradicted in a proper way as we shall see hereafter. We have assumed that the original question was asked in good faith, as would be the presumption, for it would be a serious matter indeed to ask a witness about a statement unless the statement was actually or apparently made before the grand jury as disclosed by the stenographer's notes. If the stenographer's notes were usable in any way the court erred in limiting the right of cross-examination. Section 2 of the Organic Act, namely, that in all criminal prosecutions the accused shall enjoy the right to be confronted with the witnesses against him. The primary idea of confrontation is the opportunity for cross-examination. Wigmore, Sec. 1398. Great liberality should be allowed in the cross-examination of a witness for the purpose of testing his accuracy or credibility, and where questions asked appear to relate to facts and circumstances within the general scope of the direct examination, it is error to exclude them. *People* v. *Westlake*, 124 Cal. 452, and other cases cited in the brief of the appellant. The court would probably not have limited the cross-examination if it had thought that counsel had a right to use the stenographer's notes in the way proposed. Of course if counsel had no right to use the notes the court did not err.

Counsel asked generally to be allowed to use the stenographer's notes to examine the witness and the court in a reasoned order refused. This is technically not the way to obtain the use of stenographer's notes already filed and in possession of counsel, but counsel should ask questions of witnesses as was done in the case of Pericás. It should be made to appear as each witness is examined that there was some contradiction in his testimony in the court-room and in that before the grand jury. If counsel was not offering to show inconsistent statements, and especially if no one

had any idea that a witness had been inconsistent in his testimony, there might be nothing in the notes of any possible benefit to court, counsel or to the investigation of the truth. Stenographer's notes may never properly be used as a sort of a club or a means of infusing dread into a witness, but they should be used solely for their legitimate purpose of laying the ground for contradiction. Nevertheless, the proper use of the stenographer's notes, supposing them to be usable, was attempted to be made in the examination of the witness Pericás and the whole case thereafter was conducted on the theory that the notes were in no way available at the trial, which attitude may have prevented an ample examination of the other witnesses as well. We shall examine the Grand Jury Law.

The pertinent sections thereof are as follows:

"Section 30.—That the sessions of the Grand Jury shall be secret. The court stenographer, or a stenographer appointed for the purpose by the court, whose remuneration shall be paid by The People of Porto Rico, may be present to take and transcribe the evidence.

"Section 31.—That the stenographic transcription shall include the names of the jurors taking part in the investigation, the evidence introduced and the decision of the complaint, and duly certified shall be submitted in full to the court before the indictment is read.

"Section 32.—That the *fiscal* may be present during the investigation of the Grand Jury only to offer such evidence as he may have, but in no case shall he be present during their deliberations."

"Section 34.—That every member of the Grand Jury shall keep secret whatever may have been said during their deliberations and the manner in which he himself or his fellow-jurors may have voted; but may, however, be compelled by any court to disclose the testimony given by a witness before the Grand Jury, in the two cases following:

"1. For the purpose of ascertaining whether such evidence is consistent with that given before the court.

"2. Upon the trial of the witness on a charge of perjury." Laws of Porto Rico, 1919, pp. 310, 312.

While there is an opportune moment for secrecy in the

grand jury proceeding, this moment passes when the indictment is filed. We shall content ourselves with a reference from Wigmore on Evidence and his citations, as follows:

"Sec. 2362. (*b*) *Privilege of Witnesses before Grand Jury; General Principle.* The witnesses and complainants appearing before the grand jury must be guaranteed temporarily against compulsory disclosure of their testimony and complaints, because otherwise the State could not expect to secure ample quantity of evidence for the information of the grand jury. The secrecy is the State's inducement for obtaining testimony. The policy is analogous to that of the privilege for informers in general (*post,* Sec. 2374). The privilege, therefore, is not the grand juror's; for he is merely an indifferent mouthpiece of the disclosure. Nor is it entirely the State's; for the State's interest is merely the motive for constituting the privilege. The theory of the privilege is that the witness is guaranteed against compulsory disclosure; the privilege must therefore be that of the witness, and rests upon his consent.

"But obviously the secrecy that is guaranteed is only *temporary* and provisional. Permanent secrecy would be more than is necessary to render the witness willing. Moreover, it would go too far by creating an opportunity for abuse; since a corrupt witness would be able to utilize it for perjured charges. This much is now univerally conceded:

"1858, Bigelow, J., in *Com.* v. *Mead,* 12 Gray 167: 'But when these purposes (as above quoted) are accomplished, the necessity and expediency of retaining the seal of secrecy are at an end. "Cessante ratione, cessat regula." After the indictment is found and presented, and the accused is held to answer and the trial before the traverse jury is begun, all the facts relative to the crime charged and its prosecution are necessarily opened, and no harm can arise to the cause of public justice by no longer withholding facts material and relevant to the issue, merely because their disclosure may lead to the development of some part of the proceedings before the grand jury. On the contrary, great hardship and injustice might often be occasioned by depriving a party of important evidence, essential to his defence, by enforcing a rule of exclusion, having its origin and foundation in public policy, after the reasons on which this rule is based have ceased to exist. The case at bar furnishes a good illustration of the truth of this remark. No possible injury to the interests of rights of the government that we can see could happen by a disclosure of the testimony given by the witness before

the grand jury. . . . . On the other hand, it is clear that the rights of the accused might be greatly affected and his peril much increased, if he can be shut out from showing the fact that an important witness against him is unworthy of credit, or that his testimony before the jury of trials is to be taken with great caution and doubt, because on a previous occasion, when called to testify on oath, he had given a different account of the same transaction from that which he has stated in his evidence at the trial.'

"1893, McSherry, J. in *Izer* v. *State,* 77 Md. 110, 26 Atl. 282: 'If witnesses who testify falsely before the grand jury are free from all the penalties of perjury merely because of the juror's oath of secrecy, the object designed to be effected by that clause of his oath would be perverted, and a measure intended to promote the public welfare would be transformed into a means to defeat the ends of justice. The law does not permit the obligation of secrecy which has been imposed for one purpose to be availed of for a totally different one. The grand juror's oath of secrecy cannot, therefore be interposed to obstruct the administration of justice.'

"But what are the limits of this temporary secrecy? The answer is, on principle, that it ceases when the grand jury has finished its duties and has either indicted or discharged the persons accused. (1) Supposing the grand jury to *indict* J.S. on Doe's testimony, it is plain that secrecy is no longer of any avail, for Doe will be summoned as a witness at the trial and will be compellable to testify. If he tells the truth, and the truth is the same as he testified before the grand jury, the disclosure of the former testimony cannot possibly bring to him any harm (in the shape of corporal injury or personal ill-will) which his testimony on the open trial does not equally tend to produce. If, on the other hand, he now testifies falsely, or if he testifies truly but formerly falsely, he is in no way a person who ought to have any privilege. The privilege therefore has no longer any reason to exist. (2) Supposing, on the contrary, that the grand jury, after hearing Doe's testimony, nevertheless *discharge* J.S., there may now be a motive for Doe to desire secrecy,— as when on a subsequent trial it is desired to impeach Doe as a witenss by showing his biased utterances against J.S. before the grand jury. But here the privilege ought also to cease, for another reason, namely, that the chance that such a disclosure will be called for is too small a contingency to have any effect 'a priori' in rendering Doe unwilling to make complaint or give testimony before the grand jury; Doe naturally will have expected that J.S. would be indicted. Moreover, when Doe is summoned on a civil

trial involving the same matters as the criminal charge, and it is desired to impeach him by his former testimony, all motive for secrecy ends, for the same reasons noted in par. (1), *supra.* Furthermore, in the other rare contingencies in which his testimony before the grand jury might become relevant (*post,* Sec. 2363, par. 2), justice requires in any case that Doe should not be exempted from disclosure.

"There remain, therefore, on principle, no cases at all in which, *after the grand jury's functions are ended,* the privilege of the witnesses not to have their testimony disclosed should be deemed to continue. This is, in effect, the law as generally accepted to-day. It is, however, not usually stated in such a broad form. The common phrase is that disclosure may be required '*whenever it becomes necessary in the course of justice.*' Disregarding a few local exceptions, this is in practice no narrower a rule than the one above deducible from principle." 5 Wigmore on Evidence, par. 2362, p. 152.

Section 31 is too plain for argument. The stenographer's notes are to be transmitted to the court, and therefore they become a public document. Section 34 contemplates the appearance of one of the jurymen himself.

States with similar laws are Iowa and Wisconsin, and their courts have spoken. *Havenor* v. *State,* 125 Wis. 444, 104 N.W. 116; *State* v. *Woodard,* 132 Iowa, 675, 108 N. W. 753. The upshot of these decisions and others that we have examined is that the stenographer's notes may be used for the purposes of cross-examination; that while the document containing the stenographer's notes may not be directly offered in evidence, it can be used by the impeaching witness to refresh his recollection, and that such an impeaching witness may be the stenographer himself or one of the grand jury.

It follows that the court erred in limiting the scope of the cross-examination of the witness Pericás and that the court was entirely mistaken in its attitude towards the stenographer's notes.

Counsel made a blanket assignment of error in regard to the instructions and we should be entitled to disregard

it. The court, although finally it gave the right instructions, seemed to have something of an impression that self-defence justifying the taking of human life arose alone in the defense of a man's own life. However, as the court pointed out later, the fear of serious bodily injury is enough. We doubt, too, unless there is some special reason therefor, whether after telling the jury the defendant should be treated as any other witness, that they should be told that this principle was true, "taking into account the natural interest he may have." The jury may make the necessary inference for itself. The other assignments of error have been treated incidentally.

The judgment must be reversed and the case sent back for a new trial.

*Reversed and remanded.*

Chief Justice Del Toro and Justices Aldrey, Hutchison and Franco Soto concurred.